**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UCB SOCIETE ANONYME and
UCB PHARMA, INC.,**

                  **Plaintiffs,**

    **v.**
                                **1:04-cv-683-WSD**

**MYLAN LABORATORIES, INC.,
et al.,**

                  **Defendants.**

## ORDER

      This matter is before the Court for construction of a claim in United States Patent No. 4,943,639 (the "'639 patent"). Each party has submitted memoranda supporting their interpretation of the claim and on April 21, 2006, the Court held a <u>Markman</u> hearing (the "Hearing") at which it heard evidence and the argument of counsel.

## I.      BACKGROUND

      These are patent infringement actions involving UCB Societe Anonyme and UCB Pharma, Inc.'s (collectively "UCB") epilepsy drug Keppra, containing the active ingredient levetiracetam. Keppra was approved by the Food and Drug Administration ("FDA") based upon a New Drug Application ("NDA") filed by

UCB. UCB holds the '639 patent for this drug. Defendants Cobalt Pharmaceuticals, Inc., Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc., Dr. Reddy's Laboratories, Ltd., and Sandoz, Inc. (collectively "Defendants") each filed an abbreviated new drug application ("ANDA"), seeking approval from the Food and Drug Administration ("FDA") to market a generic version of Keppra prior to the expiration of the '639 patent. In their paragraph IV certification, submitted as part of their ANDA, Defendants claim UCB's patents are invalid and will not be infringed by the generic drugs. Defendants have not yet sold their generic drug products.

At issue in this case is Claim 1 of the '639 patent, which states: "(S)-alpha-ethyl-2-oxo-1-pyrrolidineacetamide substantially free of (R)-alpha-ethyl-2-oxo-1-pyrrolidineacetamide." ('639 patent, col. 10, ll. 18-20.)[1] The only dispute between the parties is the construction of the phrase "substantially free." UCB argues the phrase, when construed according to its customary meaning to one of ordinary skill in the art, means "largely, but not necessarily wholly free," or,

_____

[1] The two molecules named in Claim 1 are enantiomers, meaning they are made up of identical atoms, but are arranged as non-superimposable mirror images of each other. The (S)-enantiomer is another name for levetiracetam. (See Sandoz's Opening Br. at 1-2; UCB's Opening Br. at 3-5.)

alternatively, "essentially free."  (UCB's Opening Br. at 2; April 21, 2006

Markman Hearing Transcript ("Hearing Tr.") at 21-22.)  Defendants argue that

during prosecution of the patent UCB "unmistakably defined 'substantially free' to

exclude the (R)-enantiomer."  (Mylan's Opening Br. at 2.)  Because UCB

disclaimed the (S)-enantiomer which included any (R)-enantiomer, Defendants

urge the Court to construe "substantially free" to mean "excludes" the (R)-

enantiomer, or, alternatively, "pure" (S)-enantiomer.  (Mylan's Opening Br. at 20;

Sandoz's Opening Br. at 1.)[2]

## II.   DISCUSSION

### A.   Claim Construction

Claim construction is a matter of law for the Court.  Markman v. Westview

Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370

(1996).  In construing claims, a Court examines how a person of ordinary skill in

the art would have understood the claim terms at the time of the invention.  Pfizer,

Inc. v. Teva Pharm. USA, Inc., 429 F.3d 1364, 1372-73 (Fed. Cir. 2005).

_____

[2] Defendant Cobalt argues for the phrase to mean "the pure (S)-enantiomer that excludes any detectible amount of the (R)-enantiomer."  (Cobalt's Opening Br. at 1.)  At the Hearing, Defendants agreed their collective position is that the claim should be construed to mean either "excludes" (R)-enantiomer or "pure" (S)-enantiomer.  (Hearing Tr. at 31.)

The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

Id. at 1373 (quotation and citation omitted). The Court initially looks only at intrinsic evidence, including the claims themselves, the specification, and the prosecution history, if it is presented. Phillips v. AWH Corp., 415 F.3d 1303, 1313-14 (Fed. Cir. 2005). "[T]he claims are 'of primary importance[] in the effort to ascertain precisely what it is that is patented.'" Id. at 1312 (quoting Merrill v. Yeomans, 94 U.S. 568, 570 (1876)). "[I]t is unjust to the public, as well as an evasion of the law, to construe [a claim] in a manner different from the plain import of its terms." Id. (quotation and citation omitted). A court should turn to extrinsic evidence only when the intrinsic evidence is insufficient to establish the clear meaning of the asserted claim. Zodiac Pool Care, Inc. v. Hoffinger Indus. Inc., 206 F.3d 1408, 1414 (Fed. Cir. 2000); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996).

"[W]ords of a claim 'are generally given their ordinary and customary meaning.'" Phillips, 415 F.3d at 1312 (quoting Vitronics Corp., 90 F.3d at 1582).

-4-

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Id. at 1316 (quotation and citation omitted).

"[C]laims must be construed so as to be consistent with the specification, of which they are a part." Merck & Co., Inc. v. Teva Pharm. USA, Inc., 347 F.3d 1367, 1370 (Fed. Cir. 2003). "It is necessary to consider the specification as a whole, and to read all portions of this written description, if possible, in a manner that renders the patent internally consistent." Pfizer, 429 F.3d at 1373 (quotation and citation omitted). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (citing Vitronics, 90 F.3d at 1582). The specification, viewed legally and practically, has the purpose to "teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." Id. at 1323.

"In addition to consulting the specification, . . . a court 'should also consider the patent's prosecution history, if it is in evidence.'" Phillips, 415 F.3d at 1317

(quoting <u>Markman</u>, 52 F.3d at 980).[3]  There is a "'heavy presumption' that claim

terms carry their full ordinary and customary meaning, unless the patentee

unequivocally imparted a novel meaning to those terms or expressly relinquished

claim scope during prosecution."  <u>Omega Eng'g, Inc. v. Raytek Corp.</u>, 334 F.3d

1314, 1323 (Fed. Cir. 2003) (citations omitted); <u>see also</u> <u>Teleflex, Inc. v. Ficosa N.

Am. Corp.</u>, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("We indulge a 'heavy

presumption' that a claim term carries its ordinary and customary meaning.").

"[B]ecause the prosecution history represents an ongoing negotiation between the

PTO and the applicant, rather than the final product of that negotiation, it often

lacks the clarity of the specification and thus is less useful for claim construction

purposes."  <u>Phillips</u>, 415 F.3d at 1317.[4]

---

[3]  The prosecution history of a patent contains the complete record of the
proceedings before the United States Patent and Trademark Office (the "PTO").
<u>Phillips</u>, 415 F.3d at 1317.  In this case it also is appropriate to examine the
prosecution history of United States Patent No. 4,836,223 ("the '223 patent), which
is related to the '639 patent.  <u>See</u> <u>Elkay Mfg. Co. v. Ebco Mfg. Co.</u>, 192 F.3d 973,
980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial
application, the prosecution history regarding a claim limitation in any patent that
has issued applies with equal force to subsequently issued patents that contain the
same claim limitation.").

[4]  "[T]he prosecution history may demonstrate that the patentee intended to
deviate from a term's ordinary and accustomed meaning . . . [and] limits the
interpretation of claims so as to exclude any interpretation that may have been

B.    (S)-enantiomer "substantially free" of (R)-enantiomer

1.    *Claim language*

The Court begins its construction of the phrase at issue with the express language of Claim 1, which provides:  "(S)-[enantiomer] substantially free of R-[enantiomer]."  ('639 patent, col. 10, ll. 18-20.)[5]  The term "substantially" is commonly used in patents.  "[W]ords of approximation, such as 'generally' and 'substantially,' are descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter."  Anchor Wall Sys., Inc. v.

_____

disclaimed or disavowed during prosecution in order to obtain claim allowance." Teleflex, Inc., 299 F.3d at 1326 (quotation and citation omitted); see also Omega, 334 F.3d at 1324.  In cases where a claim interpretation has been unequivocally disavowed so that a patent would be issued, "the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."  Omega, 334 F.3d at 1324.  The doctrine of prosecution disclaimer does not apply "where the alleged disavowal of claim scope is ambiguous."  Id. at 1325 ("[W]e have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope."). Defendants withdrew their doctrine of disclaimer argument and asked the Court, when interpreting the disputed claim, to consider the prosecution history solely as intrinsic evidence.  (See Hearing Tr. at 109-10.)  Even if Defendants had not abandoned their disclaimer argument the Court would have concluded the prosecution statements at issue here were too vague and ambiguous to support a disclaimer or disavowal argument.

[5]  The phrase "substantially free" is used in a similar way in Claim 2 of the '639 patent.  ('639 patent, col. 10, ll. 21-23.)

<u>Rockwood Retaining Walls, Inc.</u>, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003)

(quotation and citation omitted).  To the extent the term "substantially" has been

interpreted to have more than one meaning, the "cases recognize the dual ordinary

meaning of this term as connoting a term of approximation or a term of

magnitude."  <u>Deering Precision Instruments, L.L.C. v. Vector Distribution Sys.,</u>

<u>Inc.</u>, 347 F.3d 1314, 1323 (Fed. Cir. 2003); <u>see also</u> <u>Ecolab, Inc. v. Envirochem,</u>

<u>Inc.</u>, 264 F.3d 1358, 1366 (Fed. Cir. 2001) ("[O]rdinarily 'substantially' means

considerable in extent, or largely but not wholly that which is specified.").   Here,

the claim language urges interpreting the term "substantially" within the phrase

"substantially free" as a term of approximation.[6]  <u>See</u> <u>Epcon Gas Sys., Inc. v.</u>

<u>Bauer Compressors, Inc.</u>, 279 F.3d 1022, 1031 (Fed. Cir. 2002) ("The phrase

'substantially constant' denotes language of approximation, while the phrase

'substantially below' signifies language of magnitude, i.e., not insubstantial."); <u>see</u>

<u>also</u> <u>Deering</u>, 347 F.3d at 1323 (noting the term "substantially" has numerous

definitions, including, *inter alia*, "largely" or "essentially"). That is, "substantially"

is used to modify and qualify the word "free" with which the term "substantially"

---

[6] Defendants acknowledge "substantially" in this context is a "word of
approximation . . . ."  (Hearing Tr. at 72.)

is associated.  This interpretation is consistent with the manner in which the word is customarily defined.  <u>See</u> <u>Blacks Law Dictionary</u>, 1428 (6th ed. 1990) (defining substantially as "essentially, without material qualification, in the main"); <u>Webster's Encyclopedic Unabridged Dictionary</u> 1897 (1st ed. 2001) (defining "substantial" as "of or pertaining to the essence of a thing; essential, material, or important").

The ordinary and customary meaning of "free" is without, or devoid of. This comports with the relevant definition of "free," which is "uncombined chemically" or "not containing a specified substance."  <u>Webster's Encyclopedic Unabridged Dictionary</u> 763 (1st ed. 2001).  Because the claim language explicitly ties the adverb "substantially," used as a term of approximation, to the adjective "free," the ordinary meaning of the phrase "substantially free" necessarily envisions some amount of deviation from a completely free state.  <u>See</u> <u>Anchor Wall Sys., Inc.</u>, 340 F.3d at 1311 (holding the phrase "'generally parallel' envisions some amount of deviation from exactly parallel").

2.    *Specification*

The Court next examines the specification.  "[C]laims must be construed so as to be consistent with the specification, of which they are a part."  <u>Merck & Co., Inc.</u>, 347 F.3d at 1370.  In this case, the phrase "substantially free" is used one time in the specification, which provides:  "Accordingly, the present invention relates to the . . . S absolute configuration, the said compound being substantially free from . . . the R absolute configuration."  ('639 patent, col. 1, ll. 54-59.)

The usage of the phrase "substantially free" in the specification is virtually identical to its usage in the claim language.  Accordingly, the specification does not contradict or modify the plain meaning of these claim terms.[7]

Defendants do not discuss the interpretation of the claim terms themselves or their usage in the specification.  Instead, Defendants argue that the prosecution history of the '223 and '639 patents requires the Court to interpret the claim differently than what the plain meaning provides.[8] [9]

_____

[7]  No party urged the Court to focus on the specification.

[8]  Defendants argue if Claim 1 of the '639 patent is constructed as UCB proposes to allow inclusion of any (R)-enantiomer, then it is invalid for indefiniteness.  The Court does not agree.  Use of an indefinite term such as "substantially" is common in patents and has been approved by the Federal Circuit on numerous occasions.  <u>See, e.g.</u>, <u>Ecolab</u>, 264 F.3d at 1367 (finding "the use of

3. *Prosecution history*

Defendants claim the prosecution history of the '223 and '639 patents demonstrates UCB unmistakably defined "substantially free" during prosecution to exclude any (R)-enantiomer, and they urge the Court to construct the phrase "substantially free" to mean "excludes" (R)-enantiomer or "pure" (S)-enantiomer. "[T]he prosecution history may demonstrate that the patentee intended to deviate from a term's ordinary and accustomed meaning . . . [and] limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." Teleflex, 299 F.3d at 1326. The Court examines the prosecution history to determine whether UCB unambiguously defined the phrase "substantially free" during prosecution sufficiently to rebut the "'heavy presumption' that claim terms carry their full

_____

the term 'substantially' to modify the term 'uniform' does not render this phrase so unclear such that there is no means by which to ascertain the claim scope"). The Court finds its use here to be appropriate, not invalid or indefinite, and sufficient to notify the public of the patentee's right to exclude. The Court notes Defendants did not focus on their invalidity argument at the Hearing.

[9] Defendants acknowledge they rely on the prosecution history in arguing their construction of the claim in dispute. (See Hearing Tr. at 73-74.)

ordinary and customary meaning . . . ." <u>See</u> <u>Omega</u>, 334 F.3d at 1323 (citations omitted).

a.    <u>The '223 patent</u>

Defendants' analysis of the prosecution history begins with the application which matured into the '223 patent (the "'223 application").[10]  UCB's original claim simply claimed the (S)-enantiomer and did not contain the "substantially free" of (R)-enantiomer language.  (<u>See</u> '223 Prosecution History, attached as Ex. D to Mylan's Opening Br., at UCB CC 0131.)  On June 16, 1987, the PTO rejected the claims as being obvious and unpatentable over a prior art British patent for the racemic mixture.[11]  The Examiner noted an isomer "is unpatentable over the racemate absent unobvious properties."  (<u>Id.</u> at UCB CC 0143.)  In response to this rejection, on November 16, 1987, UCB filed with the PTO its Amendment to the

_____

[10]  At the Hearing, Defendants began their analysis with the original application for these claims -- Application No. 733,790 (the "'790 application"). The '223 application was a divisional application of the '790 application. Defendants agreed the record of the '790 application is replicated in material aspects in the '223 application.  (Hearing Tr. at 54.)  Because Defendants in their briefing begin their analysis with the '223 patent prosecution history, (<u>see</u> Mylan's Opening Br. at 9), the Court will do so here.

[11]  The racemic mixture refers to a fifty-percent (S)-enantiomer and fifty-percent (R)-enantiomer mixture.

application, submitting the declaration of Jean Gobert to overcome the obviousness rejection by demonstrating the (S)-enantiomer produces unexpectedly superior results when compared to the mixture of (R) and (S)-enantiomers.  In the remarks section of its Amendment, UCB, incorporating the language of the Gobert declaration, states:

> Since the S-enantiomer shows a substantially higher anti-hypoxia and anti-ischemia activity than the racemate, and the R-enantiomer is completely inactive, *removal* of the latter and *isolation* of the S-enantiomer *free of* the R-enantiomer is important in providing a more potent drug .
> . . .

(Id. at UCB CC 0150 (emphasis added); Hearing Tr. at 53-54.)

On February 26, 1988, the PTO again rejected UCB's claims.  The Examiner stated:

> Certainly the pure (S) isomer is obvious from the (R, S) mixture, since in the particular utilities urged only the (S) isomer is active.  Thus while the activity therein of the (R, S) mixture is expectedly diluted by the presence of the (R) isomer nothing unexpected is evident by the use of the pure (S) isomer versus the (R, S) isomeric mixture of the prior art. . . .  In fact the (R, S) isomeric mixture and all pharmaceutical uses is fully embraced by composition claim 6.  The (R) isomer would merely be an "inert diluent".

(Id. at UCB CC 0162; Hearing Tr. at 56.)  After this rejection, on May 31, 1988, UCB met with the Examiner to discuss the rejection.  At the conclusion of the interview, the Examiner recorded in his summary record:

> Atty's urged that pure (S) isomer only obtained by steriospecific [sic] synthesis, and pharm. compositions thereof clearly are distinguished from Brit. Pat. (R,S) mixture which is non-enabling for pure isomer.  This will be urged in response and also will amend comp. claim to exclude the other isomer (R) and intended pharmaceutical uses.

(Id. at UCB CC 0164.)

On July 19, 1988, UCB amended its claims to cancel all remaining claims and to add new Claim 8.  The new Claim 8 stated "(S)-[enantiomer] substantially free of (R)-[enantiomer]."  (Id. at UCB CC 0168.)  This is the first time the "substantially free" language was included in the claims.  In the remarks, UCB stated:

> Additionally, the claim as now presented specifies that the composition is substantially free of the dextrorotatory enantiomer.  This is specified in order to clearly avoid the Examiner's argument set forth in the Official Action to the effect that the (R) isomer could be present merely as an inert diluent. . . .  The Examiner indicated that upon the filing of the instant response, he would give full consideration to the arguments presented and would make his decision based upon such arguments.

(Id. at UCB CC 0170.)  On November 15, 1988, the PTO rejected Claim 8

containing the "substantially free" phrase, stating:  "Applicant[']s arguments have

been carefully considered but [are] unpersuasive that the rejection of the pure 'S'

compound is improper."  (Id. at UCB CC 0189.)[12]

        b.    The '639 patent

On February 16, 1989, UCB filed the application which matured into the

'639 patent (the "'639 application").[13]  Claim 8 of the '639 application, which

issued as Claim 1 of the '639 patent, claimed the (S)-enatiomer "substantially free"

of (R)-enantiomer.  (See '639 Prosecution History, attached as Ex. E to Mylan's

Opening Br., at UCB CC 0059.)  This claim was rejected again for obviousness

based on the British patent, which discloses the racemic mixture.  In response to

this rejection, UCB filed an amendment on December 4, 1989, noting the

Examiner's position is that "the pure (S) isomer would be *prima facie* obvious

---

[12] The Examiner allowed Claim 9, which contained a process limitation in
addition to the "substantially free" language, and further indicated the PTO would
allow UCB to rewrite its claim to make it a product-by-process claim.  (Hearing Tr.
at 67-68.)  In its Amendment after final rejection, UCB added the product-by-
process claim and obtained a patent on that claim.  (Id. at 74.)

[13] The '639 application was filed as a division of the '223 application.

from the (R,S) mixture." (Id. at UCB CC 0069.) UCB again submitted the Gobert declaration, stating that "removal of the [(R)-enantiomer] and isolation of the S-enantiomer free of the R-enantiomer is important in providing a more potent drug . . . ." (Id. at UCB CC 0071.) Claim 8 of the '639 application ultimately issued as Claim 1 of the '639 patent without further discussion of the "substantially free" language. (Mylan's Opening Br. at 14.)

c.    <u>Analysis</u>

Defendants argue the prosecution history of both the '223 and '639 patents compels the conclusion that "substantially free" excludes the (R)-enantiomer. Defendants argue the '223 patent prosecution history demonstrates UCB understood the claim would be allowed only if the (R)-enantiomer was excluded because: (i) UCB stated "removal of" the (R)-enantiomer and "isolation" of the (S)-enantiomer "free of" the (R)-enantiomer was important, (ii) UCB represented to the Examiner that the claim would be amended "to exclude the other isomer (R)" and used the phrase "pure (S) isomer," and (iii) UCB told the Examiner its new claim "clearly avoid[ed] the Examiner's argument that the (R)-isomer could be present merely as an inert diluent . . . ." (Mylan's Opening Br. at 15; Sandoz's Opening Br. at 8.)

Defendants further argue the prosecution history of the '639 patent confirms UCB defined "substantially free" as "excluding" the (R)-enantiomer. Defendants refer to the following evidence of UCB's actions: (i) the Examiner noted, and UCB confirmed, the claim was directed towards the "pure" (S)-enantiomer, and (ii) UCB again argued the importance of "removal" of the (R)-enantiomer, "isolation" of the (S)-enantiomer and that the (S)-enantiomer was "free" of the (R)-enantiomer. (Mylan's Opening Br. at 17.) Defendants claim this history "compel[s] the conclusion that the term 'substantially free' as it appears in claim 1 of the '639 patent excludes the (R)-isomer." (Mylan's Opening Br. at 18; Sandoz's Opening Br. at 9-10.)

The Court has reviewed the prosecution history presented by Defendants and UCB, including the arguments set forth in the parties' briefs and at the Hearing. During prosecution of the patents, the PTO initially rejected UCB's claims for the (S)-enantiomer based on the prior art, which included a racemic mixture of the (R) and (S)-enantiomers. To overcome the PTO's obviousness objection to the patentability of the (S)-enantiomer, UCB was required to demonstrate the unexpected benefits and results of the (S)-enantiomer as compared to the racemate. The language used by UCB to distinguish the (S)-enantiomer from the racemate,

for purposes of demonstrating unexpectedly better results, was "removal of the [(R)-enantiomer] and isolation of the S-enantiomer free of the R-enantiomer . . . ." This language clearly distinguished the new claim from the prior art, which included a fifty-fifty mixture of the (R) and (S)-enantiomers.

However, the prosecution history does not focus on the distinction between "substantially free" and "free." Instead, the exchanges between UCB and the PTO concerned whether UCB could patent the (S)-enantiomer in light of the previously issued patent for the racemate. That UCB was participating in a back and forth negotiation with the PTO is clear. The Court cannot conclude from the prosecution history cited by Defendants that UCB intended to alter the language of the patent claim or that the PTO interpreted the "substantially free" terms to mean pure (S)-enantiomer. The Court finds this discussion between the PTO and UCB does not disclose a clear and unambiguous disclaimer, disavowal, alteration or modification of the ordinary and customary meaning of "substantially free." See generally Phillips, 415 F.3d at 1317 ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."); Salazar v. Procter & Gamble Co.,

414 F.3d 1342, 1347 (Fed. Cir. 2005) ("[A]n applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope.").  Indeed, the exchanges illustrate UCB's resolve to resist characterizing the (S)-enantiomer as pure.

The Examiner's notes recorded after the meeting with UCB's attorneys do not compel a different conclusion.  At the conclusion of the interview, the Examiner, in his own words, recorded his belief that UCB would amend its claims to distinguish them from the prior art and to "exclude the other isomer (R)."  After the interview, however, UCB did not unequivocally, completely "exclude" (R)-enantiomer, but instead elected to use the phrase "substantially free" of (R)-enantiomer.  The Examiner did not require UCB to remove the term "substantially," and UCB did not represent that "substantially" should be construed in any way other than its ordinary meaning.  Thereafter, the patent issued with this language.  The prosecution history cited by Defendants simply does not persuade the Court that UCB intended, or that the PTO envisioned or processed the application with, the claim interpretation advocated by Defendants.  Defendants have not overcome the heavy presumption that claim terms carry their customary

and ordinary meaning, and the Court constructs the disputed phrase in the '639 patent according to its customary and ordinary meaning.

## III.    CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the term "substantially free" in Claim One shall be constructed in the litigation as "essentially free."

**SO ORDERED** this 14th day of June, 2006.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE